BARBARA COAL COMPANY, INC., DISSOLVED, JAMES J. DURKIN, JR., TRUSTEE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Barbara Coal Co. v. Commissioner
Docket No. 4185-81.
United States Tax Court
T.C. Memo 1987-466; 1987 Tax Ct. Memo LEXIS 462; 54 T.C.M. (CCH) 533; T.C.M. (RIA) 87466; September 16, 1987. Thomas W. Ostrander and Ronald F. Kidd for the petitioner. Eugene J. Wien and Theodore L. Marasciulo, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined a deficiency in petitioner's Federal corporate income tax for the fiscal year ended April 30, 1974, in the amount of $ 378,798.79. After *463 concessions by petitioner, [1] the sole issue for decision is whether petitioner was a collapsible corporation within the meaning of section 341(b)[2] and, therefore, precluded from using the nonrecognition provisions of section 337 on the sale of its assets incident to a complete liquidation. Resolution of this issue depends on whether the sale of petitioner's assets and subsequent liquidation were attributable solely to unanticipated and unforeseeable circumstances beyond petitioner's control. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The first and second stipulations of facts and exhibits thereto are incorporated herein by this reference. Petitioner, Barbara Coal *464 Company, Inc., Dissolved (hereinafter sometimes referred to as Barbara Coal), was a domestic corporation, incorporated on January 4, 1971, under the laws of the Commonwealth of Pennsylvania. Barbara Coal filed its corporate Federal income tax return (Form 1120) for its fiscal year ended April 30, 1974 with the Internal Revenue Service Center in Philadelphia, Pennsylvania. James J. Durkin, Jr., petitioned this Court in his capacity as trustee for Barbara Coal, and resided in Wilkes Barre, Pennsylvania, at the time of the filing of the petition. As of January 4, 1971, James J. Durkin, Sr., and his wife Anna Jean Durkin each owned one-sixth (1/6) of the outstanding stock of Barbara Coal and Louis Falzone and John Williams each owned one-third (1/3) of the outstanding stock. On January 7, 1971, Blue Coal Corporation (Blue Coal) and James J. Durkin, Sr., (Durkin, Sr.) entered into a General Agreement whereby Blue Coal would sell to Durkin, Sr., or his corporate designee, certain real and personal property for the stated consideration of $ 850,000. On October 5, 1971, Blue Coal and Durkin, Sr., entered into an agreement amending the General Agreement of January 7, 1971. This subsequent *465 agreement, among other things, reduced the purchase price of the property to $ 700,000. However, the amending agreement made no change with respect to the property to be acquired under the General Agreement. By agreement dated October 25, 1971, Louis Falzone assigned to Edward Durkin and to James J. Durkin, Jr., as tenants in common, all of his interest (33-1/3 percent of the whole) in the General Agreement dated January 7, 1971, for the total consideration of $ 66,666.66. [3] On November 12, 1971, Barbara Coal adopted a corporate resolution authorizing the president or vice president, and secretary or treasurer to borrow the sum of $ 700,000 from the First National Bank of Eastern Pennsylvania, at a rate of 8 percent per annum. [4]
*466 On November 15, 1971, Barbara Coal obtained a purchase money mortgage from the First National Bank of Eastern Pennsylvania in the amount of $ 700,000 at the rate of 8 percent per annum on the unpaid balance. [5] Petitioner used the proceeds of this mortgage to purchase the property from Blue Coal, as set forth in the Bill of Sale dated November 15, 1971, pursuant to the terms of the General Agreement of January 7, 1971, as amended on October 5, 1971. The $ 700,000 purchase money mortgage was secured by all the assets purchased under the General Agreement, as amended. The property Barbara Coal purchased from Blue Coal in this transaction essentially included all of the assets that Blue Coal owned west of the Susquehanna River. *467 Included among those assets were approximately 1,290 acres of land located in the boroughs of Larksville, Courtdale, Pringle, and Edwardsville, Pennsylvania. Some of this land had previously been strip mined and some was available for immediate sale. There were also approximately 15,000,000 tons of bank-run on this property, 4,000,000 tons of coal in the ground ready to be stripped, and 1,000,000 tons of fine coal in place. A significant portion of the assets purchased by Barbara Coal consisted of the real and personal property that comprised the coal processing plant known as the Loree Colliery. More specifically, the assets purchased included a coal processing plant and related equipment, culm banks containing unrecovered coal, and the land underneath and surrounding the plant and the culm banks. In all, a total of 1,647.03 acres of land was acquired, which included various parcels of land unrelated to the Loree Colliery that were scattered throughout the area. [6]
*468 The coal processing plant known as the Loree Colliery contained a breaker, an office building containing approximately 6,000 square feet, a car shop containing 2,400 square feet, a machine shop containing 4,500 square feet, a storehouse containing 3,000 square feet, and a lumber shed containing 3,600 square feet. These buildings were constructed of steel, cinder block, brick, and concrete. [7] The breaker or crusher, some five or six stories tall, broke the coal into smaller pieces and was the major component of the coal processing plant. [8]
*469 At the time of the sale from Blue Coal to Barbara Coal, the Loree Colliery had not been in operation for some period of time. The Colliery had been built around the turn of the century and was originally used to process deep mine coal, but it also may have been used in later years to process strip mine coal. The existing equipment at the Loree Colliery extracted only 80 to 85 percent of the coal from the mined material. Consequently, the waste product discarded in these early years still contained about 15 to 20 percent of coal. After years of stacking and piling this waste product, these bank-run materials, coal refuse banks of "culm banks," as they are variously called, were literally large mountains containing this unrecovered coal. The project Barbara Coal intended to undertake was to reclaim or recover the coal still contained in these culm banks by recycling this material through more modern and sophisticated breaker equipment. In order to extract the remaining coal from the culm banks, the Loree Colliery breaker had to be renovated to install improved equipment and technology that by then had been developed in the industry. However, the stockholder of Barbara Coal had *470 no experience or expertise in the design, construction, or renovation of a breaker and, accordingly, sought recommendations and bids from four or five contractors, including the Roller Corporation. [9] It was estimated that the renovation would cost approximately $ 450,000. By agreement dated August 7, 1972, Barbara Coal engaged D & L Consultants to try to obtain the necessary financing for the renovation of the breaker. *471 Barbara Coal engaged the Roller Corporation to make preliminary studies of the breaker. By letter dated November 17, 1972, Roller Corporation advised Barbara Coal that in order to initiate engineering studies for the renovation of the breaker, field work at the site was necessary to establish the working dimensions of the existing structures. In order to commence this field work, Roller Corporation requested an advance payment of $ 1,500, which would be applied against the total contract price in the event the renovation contract was awarded to the Roller Corporation. On November 27, 1972, Barbara Coal agreed to Roller's request. Roller Corporation completed the engineering studies and prepared drawings of the proposed renovations of the breaker. By agreement dated April 9, 1973, Barbara Coal retained the Roller Corporation to renovate the breaker at the Loree Colliery in accordance with the drawings and specifications that Roller had previously submitted. Roller Corporation accepted this agreement on May 15, 1973. The price of the renovation work, as set forth in the agreement, was $ 439,000, less the $ 1,500 previously paid for the field studies. Except for minor finishing *472 work and certain cleanup work, the contract contemplated that the major portion of the work was to be completed, with the plant ready for operation by November 15, 1973, i.e., six months after Roller Corporation accepted the contract. The contract also provided that the time for completion of the work was contingent upon delays occasioned by labor troubles, strikes, shortages, fire, accident, or other causes beyond the control of the contractor. The contract did not provide that time was of the essence. According to the contract terms, after the renovations, the breaker would be guaranteed to process 250 TPH (tons per hour) of presized coal material ranging in size from stove to rice (2-1/2" to 3/16"). However, the terms of the contract did not provide that the renovated breaker would have the capability of recovering or processing fine coal. [10] Petitioner had no reasonable basis for assuming that the renovated breaker would have the capability of recovering or processing fine coal. [11]
*473 D & L Consultants were unsuccessful in securing financing for Barbara Coal. However, Barbara Coal submitted an application to the United Penn Bank for a mortgage loan in the amount of $ 1,150,000. The purpose of the loan was to pay off the existing mortgage of $ 600,000 still held by First National, to renovate the Loree Colliery breaker at a cost of $ 450,000 and to pay off Barbara Coal's unsecured loan in the amount of $ 100,000. The minutes of the United Penn Bank Discount Committee meeting indicate that Barbara Coal's loan application was approved on April 19, 1973. The assets of Barbara Coal at that time were valued at $ 1,772,500. Moreover, Barbara Coal projected that its yearly cash flow would consist of $ 316,000 [12] from the coal in the culm banks and $ 125,000 from various land sales, for a total yearly cash flow of $ 441,000. The Discount Committee considered this to be more than adequate to make the yearly mortgage payments of $ 163,812. [13]
*474 By letter dated June 20, 1973, Patricia O'Brien, an assistant cashier in the commercial loan department at the United Penn Bank, notified Henry Greenwald, Barbara Coal's attorney, that Barbara Coal's request for the mortgage loan had been approved in the amount of $ 1,150,000. The loan was made subject to certain conditions. The loan agreement was to be drawn to provide that one-third of all lot sales and fifty cents per ton of all culm bank sales would be applied to the mortgage and that United would receive a security agreement covering all culm banks, machinery, and equipment on the land. In addition, United would receive a first mortgage covering 1,000 acres of land and the Loree Colliery breaker for a period of 7 years and 9 months. Repayment terms would be interest only for the first 9 months at a designated rate and thereafter monthly installments of interest and principal for 84 months. By letter dated June 21, 1973, petitioner agreed to these conditions. On October 4, 1973, United Penn Bank and Barbara Coal finalized the arrangements for the mortgage loan and Barbara Coal was issued a cashier's check in the amount of $ 1,150,000. The mortgage loan was secured by *475 a bond, a first mortgage on all of Barbara Coal's property, and United Penn Bank's taking a security interest in all of Barbara Coal's personal property. Moreover, the loan was personally guaranteed by James J. Durkin, Sr., his wife Anna Jean Durkin, James J. Durkin, Jr., and Edward Durkin. The repayment provisions of the loan obligated Barbara Coal to make interest payments only during the initial nine-month period of the loan, at an annual rate of 2 percent over the rate the bank charged its prime borrowers. Thereafter, the loan obligated Barbara Coal to make 84 monthly installments of $ 13,690.48, plus interest at 2 percent per annum over the rate charged by the bank to its prime borrowers at each of the monthly intervals. The first principal payment on this loan was not due until July of 1974. [14]
*476 The mortgage loan to Barbara Coal in the amount of $ 1,150,000 was not issued until October 4, 1973. However, from May 1, 1973 to September 19, 1973, United Penn had made a series of cash advances to Barbara Coal totaling $ 769,292.60, secured by notes and apparently in contemplation of the issuance of the mortgage loan. In addition to paying off the existing mortgage to the First National Bank of Eastern Pennsylvania, these advances were used to make periodic payments on the breaker renovation that was already in progress. The following sets forth the date, note number, amount, and purpose of each cash advance made to Barbara Coal from May 1, 1973 to September 19, 1973: Date of
Note
Advance
Number
Amount
Disbursement Method
5/01/73
95549
$ 65,625.00 Unknown - Initial payment to
Roller Corporation upon signing
of contract.
6/15/73
95817
11,345.40 Cashier's Check No. 054388 pay-
able to Roller Corporation.
6/15/73
95816
648,523.62 Cashier's Check No. 054389 pay-
able to First National Bank of
Eastern Pennsylvania.
7/31/73
96063
22,690.80 Cashier's Check No. 071092 pay-
able to Roller Corporation.
9/06/73
96289
2,836.35 Cashier's Check No. 086679
payable to Roller Corporation.
9/19/73
96390
34,391.43 Cashier's Check No. 087334 pay-
able to Wyoming Electric Line
Construction Co., Inc.
($ 4,170.18).
Cashier's Check No. 087334 pay-
able to Roller Corporation
($ 30,221.25).
Total
$ 785,412.60
*477 In September of 1973, Barbara Coal had made two payments of principal on these notes totaling $ 16,120, which reduced the total due on the above six notes to $ 769,292.60. The mortgage loan proceeds that Barbara Coal received on October 4, 1973 by cashier's check No. 086873 in the amount of $ 1,150,000 were disbursed as follows: Pay off above six notes totaling
$ 769,292.60
Plus interest on these notes
21,922.47
Pay off No. 90580 dated May 25, 1972
22,000.00
Plus interest on same
406.39
Pay off note No. 95219 dated April 9, 1973
50,000.00
Plus interest on same
923.60
Pay off note No. 88957 dated February 7, 1972
50,000.00
Plus interest on same
976.39
Deposit to escrow for taxes
40,000.00
Deposit to escrow for Roller Corporation payments
94,478.55
Total
$ 1,150,000.00
As indicated above, Roller Corporation had started the renovation work on the breaker and had received payments totaling $ 132,718.80 prior to Barbara Coal's receiving the proceeds of the $ 1,150,000 mortgage loan. [15]
*478 Pursuant to the terms of the renovation contract, Barbara Coal was required to furnish the materials and labor for a portion of the work. However, during the months of September, October, and November of 1973, a series of negotiations took place between Barbara Coal and Roller Corporation, with the result that it was finally agreed that Roller Corporation, for an additional sum of $ 76,100, would assume the responsibility for the materials and work delegated to Barbara Coal under the original contract and for replacement of a certain pump. [16]
*479 The work that had been delegated to Barbara Coal under the original contract and that was assumed by Roller Corporation as additional work included the following: 1. To furnish materials and labor for a tailings
slurry pipeline from the existing new coal
cleaning plant to the old mine shaft for
disposal of black water and silt.
$ 17,500
2. To develop and provide fresh water supply
for heavy media washer. Equipment,
materials and labor.
15,800
3. To furnish materials and labor for required
lighting (including floodlight) and two
(2) blower-type heaters.
15,800
4. To furnish labor for Roll House excavations
cleanup for rock disposal area, cleanup
around breaker and recondition scales.
22,400
Total
$ 71,500
It was also agreed at that time that Roller Corporation would assume the responsibility of replacing, for an amount of $ 4,600, a Wemco pump that had been damaged by fire. That brought the total additions to the Roller contract to $ 76,100. The additional work for $ 17,500 involving the tailing slurry pipeline was approved by Barbara Coal pursuant to a contract dated September 21, 1973. *480 The purchase of the Wemco pump for $ 4,600 was approved by Barbara Coal on October 26, 1973. The remainder of the additional work totaling $ 54,000 was approved by Barbara Coal on November 12, 1973. The parties to the renovation contract were clearly aware at that point that this additional work would not be finished by November 15, 1973, the completion date contemplated under the original contract. There is nothing in the record to show the reasonable period of time required for Roller Corporation to complete these additions to the contract. By letter dated October 19, 1973, Roller Corporation had requested Barbara Coal to make arrangements with the United Penn Bank to increase the mortgage by the amount of $ 76,100 to cover this additional work. Roller Corporation indicated to Barbara Coal that time was of the essence since winter was approaching and most of this additional work to be done was outside work. In addition, Barbara Coal was aware that Roller Corporation needed authorization from the United Penn Bank to invoice this additional work. On November 21, 1973, six days after the completion date contemplated under the original contract, the Discount Committee of the *481 United Penn Bank approved Barbara Coal's request to increase its mortgage from $ 1,150,000 to $ 1,300,000, subject to receiving an updated personal statement of James Durkin, Sr. The minutes of the Discount Committee meeting stated that the increase was needed to meet a substantial increase in the cost to rebuild the Loree breaker. [17] The property of Barbara Coal securing the original mortgage was valued at $ 1,772,500 as appraised by Robert Harvey. Prior to the mortgage increase, the ratio of the original mortgage to the appraised value of that property was 64.8 percent; after the mortgage increase, the ratio was 73.34 percent. However, an updated projection of Barbara Coal's earnings from the sale of coal indicated a yearly profit before taxes in the amount of $ 1,680,500, a profit of $ 125,000 from land sales, and a profit of $ 50,000 from landfill projects, for a total estimated annual profit of $ 1,855,500. *482 In the fall of 1973, Barbara Coal was also involved with certain other Durkin family business transactions unrelated to the renovation of the Loree Colliery breaker. On August 3, 1973, James Durkin, Sr., or his nominee or nominees, had entered into an agreement [18] for the purchase of all of the outstanding stock of (1) Raymond Colliery Company, Inc. (Raymond group), and all of its seven subsidiaries, (including Blue Coal Corporation); (2) Minindu Corporation; (3) Gilco, Inc., a Pennsylvania corporation; and (4) Olyphant Associates, Inc., and Olyphant Premium Anthracite, Inc., both Pennsylvania corporations. The purchase price of the stock of these 12 corporations was $ 7,200,000 payable in cash upon closing. Shortly after signing this agreement, James Durkin, Sr., assigned his interest in this purchase agreement to a holding company known as the Great American Coal Company. In connection with the purchase of the Raymond group by Great American Coal Company, James Durkin, Sr., contributed $ 165,020 from his personal funds to finance the purchase. In addition, James Durkin, Jr., and Edward Durkin borrowed $ 400,000 in September or October of 1973 from the Wyoming National Bank *483 and loaned these proceeds to the Great American Coal Company to help fund the purchase of the Raymond group. However, neither James J. Durkin, Jr., nor Edward Durkin acquired any interest in the Raymond group stock acquisition. Great American Coal Company's purchase of the Raymond group was closed on November 26, 1973. Most of the financing for this purchase was obtained through Institutional Investors Trust. In connection with this purchase, Barbara Coal executed a mortgage on November 1, 1973, on all of its real and personal property in favor of Institutional Investors Trust (a real estate investment trust). [19] This mortgage was issued to guarantee the $ 8,530,000 mortgage loan issued by Institutional Investors Trust to finance this acquisition. *484 Another transaction, apart from the acquisition of the Raymond group, was entered into at the closing on November 26, 1973. Susquehanna Coal Company (seller) entered into an agreement with Great American Coal Company, Raymond Colliery Company, Blue Coal Corporation, and among other, Barbara Coal (joint buyers) for the sale and purchase of the Glen Lyon breaker for the amount of $ 741,850. [20]
*485 Not unexpectedly, the renovation work on the Loree Colliery breaker was not completed by November 15, 1973. During December of 1973 and January of 1974, most of the work that Roller Corporation billed to Barbara Coal pertained to the additional work that Barbara Coal had originally been required to perform. Essentially the work on the original contract was completed by the end of January 1974. During February of 1974, all the work billed by Roller Corporation pertained to the additional work. Roller Corporation completed all the billable work under the original renovation contract and under the additions to the contract by March 1, 1974. There is some uncertainty in the record as to the stock ownership of Barbara Coal in the period from November of 1973 through late January of 1974. In the Note Purchase and Loan Agreement dated November 26, 1973, that was executed in connection with the Raymond group stock acquisition, paragraph 3.14 of that agreement stated that all of the authorized stock of Barbara Coal was owned by: James J. Durkin, Sr., and Anna J. Durkin, his wife (50 percent), James J. Durkin, Jr., (25 percent), and Edward Durkin (25 percent). However, on January 27, 1974, John *486 R. Williams entered into an agreement to see his one-third (1/3) interest in Barbara Coal to James J. Durkin, Jr., and Edward E. Durkin. [21]
Sometime between November 26, 1973, and February 18, 1974, Kenneth Pollock and Mr. Durkin, Jr., had met in the office of Robert Jones, the president of the United Penn Bank, and had orally agreed to the terms for the sale of most of Barbara Coal's *487 assets to Kenneth Pollock. [22] Upon reaching an agreement, Mr. Pollock, Mr. Durkin Jr., and Mr. Jones visited Charles Parente, Barbara Coal's accountant, at his office, at which time Mr. Parente in his own handwriting transcribed the terms of the parties' oral agreement onto legal-sized paper. Mr. Pollock signed the agreement in Mr. Parente's office on the day that it was drafted; however, James J. Durkin, Sr., and James J. Durkin, Jr., signed the agreement at a subsequent date not shown by the record. [23]
*488 On February 18, 1974, at a combined meeting of the board of directors and the stockholders of the common stock of Barbara Coal, a plan to liquidate was adopted. Subsequently, settlement was held on February 25, 1974 on the sales agreement with Mr. Pollock and Susquehanna Coal Company. Pursuant to this agreement, Kenneth Pollock and Susquehanna Coal Company agreed to purchase the following assets from Barbara Coal: 1.
652 acres of real property (surface and mineral rights)
held by Barbara Coal; [24]
2.
Loree Colliery;
3.
50 acres of surface land surrounding the Loree Colliery;
4.
All refuse, silt, etc., banks presently owned by
Barbara Coal;
5.
All surface land on which refuse, silt, etc., banks are
located (included in the 652 acres);
6.
All mineral rights attached to all surface land being
transferred.
*489 The consideration for the purchase of these assets was $ 2,000,000 payable as follows: Cash upon transfer
$ 1,300,000
Three-year note from Kenneth Pollock
to be paid monthly with 6% interest
350,000
Assignment of a $ 350,000 note to
Barbara Coal that Susquehanna had aquired
previously from Blue Coal Corporation
as partial consideration for the
purchase of the Glen Lyon breaker
350,000
To consummate this transaction, Mr. Pollock secured a $ 1,300,000 loan from the United Penn Bank. The proceeds of this loan were disbursed at the closing as follows: Loan Proceeds
$ 1,300,000.00
Disbursements:
Principal Reduction Barbara Coal
243,467.00
Roller Escrow Account
(Balance due on construction
95,617.60
Barbara Coal Escrow
60,794.92
Barbara Coal Demand Loan
100,120.48
$ 500,000.00
Cashier's Check to Barbara Coal
800,000.00
$ 1,300,000.00
At the time of the sale, Barbara Coal was not in default on its original mortgage loan from United Penn Bank. Barbara Coal had made the required interest payments pursuant to the loan agreement, and no principal payments *490 were as yet due. See n. 14, supra. Specifically, Barbara Coal made an interest payment in the amount of $ 11,412.15 in November of 1973 and also made a payment on the principal in the amount of $ 2,183. In December of 1973, Barbara Coal made an interest payment in the amount of $ 11,241.89 and a payment on the principal in the amount of $ 4,350. These principal payments constituted proceeds from Barbara Coal's land sales, one-third of which, under the terms of the original loan agreement, had to be paid to United Penn Bank. As of February 24, 1974, the balance remaining on Barbara Coal's original loan of $ 1,150,000 was $ 1,143,467. On February 25, 1974, at the closing on the sale to Pollock and Susquehanna Coal, Co., Barbara Coal made another interest payment in the amount of $ 11,148.61 and applied $ 243,467 of the proceeds from the sale to Pollock toward the principal of the loan, reducing the loan balance to $ 900,000. [25] Barbara Coal continued to make occasional interest payments on the loan, but did not make another payment on the principal under October of 1975, at which time $ 184,304.25 was applied toward the principal. Barbara Coal's defaults on the United Penn *491 Bank loan all occurred after the sale of its assets. *492 At the time of the sale to Mr. Pollock, Barbara Coal had approximately 1,300 acres of land. The sale to Pollock included 652 acres, consisting essentially of the land with coal deposits and the land on which the Loree Colliery breaker plant was situated, the culm banks, and the land underneath and surrounding the culm banks, and the land underneath and surrounding the culm banks. The $ 900,000 balance remaining on Barbara Coal's original loan was secured by the approximately 650 acres of land that Barbara Coal retained, which was virtually worthless, [26] and the personal guarantees of the Durkin family. The record does not indicate whether or not United Penn Bank had any interest in the $ 350,000 personal note from Mr. Pollock to Barbara Coal, or the $ 350,000 interest in the note from Blue Coal to Susquehanna Coal that was assigned to Barbara Coal, the only other assets left to secure the $ 900,000 loan balance. On May 20, 1974, the operator of the Loree Colliery breaker *493 (Kenneth Pollock/Heavy Media, Inc.) accepted the breaker and the Roller Corporation submitted its final bill. Roller's final bill, dated May 22, 1974, in the amount of $ 43,750 represented the retainage withheld on the original contract price. [27] At some point in the period from March of 1974 through May 20, 1974, when the plant was accepted, Roller Corporation fine tuned or "debugged" the plant. During this period, the plant was operating and producing coal. As various problems would arise, the plant would be shut down to make the necessary adjustments in the equipment. The debugging process was Roller Corporation's responsibility and was not billable work. When the plant was accepted on May 20, 1974, the Loree breaker had the capacity to process 250 tons of coal per hour, ranging in size from stove to rice (2-1/2" to 3/16"), *494 as required by the contract specifications. The renovated plant, however, did not have the capacity to process fine coal. See nn. 10, 11, supra. The plant was eventually equipped with diester tables to process fine coal at some point after Roller Corporation completed the original renovation of the Loree breaker. Roller Corporation was not involved with this subsequent installation of diester tables. The Roller Corporation completed its contract essentially for the agreed upon original contract price plus the agreed upon increased amount for the additional work. The following is a complete list of the dates and amounts of the payments that Roller Corporation received for renovation of the Loree breaker, including payments under both the original contract and the additions to the contract: 5/1/73
$ 65,625.00
6/15/73
11,345.40
7/31/73
22,690.80
9/6/73
2,836.35
9/19/73
30,221.25
9/19/73
* 4,170.18
10/8/73
81,751.95
11/1/73
81,498.30
11/30/73
35,384.80
12/26/73
35,212.25
1/11/74
13,199.55
2/4/74
38,216.75
2/26/74
28,957.60
4/8/74
22,910.00
8/1/74
30,000.00
9/6/74
12,250.00
10/31/75
* 400.00
Total
$ 516,670.18
*495 All of the payments from the $ 76,100 increase to the contract occurred after the sale of Barbara Coal's assets. In 1974, Barbara Coal made a liquidating distribution to its shareholders in the amount of $ 750,000. James J. and Anna Durkin received a total of $ 250,000 and James J. Durkin, Jr., and Edward Durkin each received $ 250,000. [28]
Barbara Coal considered the nonrecognition provisions of section 337 applicable to the gain realized from the February 25, 1974 sale to Pollock, and accordingly, on its corporate Federal income tax return for the fiscal taxable year ended April 30, 1974, Barbara Coal did not include this gain as income. By statutory notice *496 of deficiency dated December 9, 1980, respondent determined that Barbara Coal was a collapsible corporation as defined in section 341(b) and, consequently, was not entitled to the nonrecognition benefit of section 337 on the sale of its assets. Respondent accordingly increased Barbara Coal's taxable income in the amount of $ 1,014,933.81 resulting from the sale on February 25, 1974, computed as follows: Selling Price
$ 2,000,000.00
Less: Adjusted Basis
652 acres to Pollock
$ 176,066.08
Breaker (original)
84,000.00
Breaker (additions)
526,000.11
Breaker (land)
10,000.00
Minerals
189,000.00
TOTAL
[29] 985,066.19
GAIN
$ 1,014,933.81
*497 OPINION On November 15, 1971, Barbara Coal purchased various assets from Blue Coal. The purchased assets included a coal processing plant known as the Loree Colliery, culm (waste) banks containing unrecovered coal, land underneath and surrounding the plant and the culm banks and various other parcels of land scattered throughout the area. Barbara Coal undertook a project to reclaim or recover the coal contained in these culm banks by recycling this waste material through the Loree Colliery breaker using improved equipment and technology. Having no experience in breaker renovation, Barbara Coal contracted with the Roller Corporation to renovate the Loree Colliery to upgrade the existing breaker equipment to handle this coal reclamation project. Within three years of its purchase of the Loree Colliery and prior to the completion of the breaker renovations, Barbara Coal adopted a plan of complete liquidation and sold a majority of its assets. The sole issue in this case is whether the sale of Barbara Coal's assets and subsequent liquidation were due to unanticipated and unforeseeable circumstances beyond Barbara Coal's control. *498 Section 337(a)[30] provides that if a corporation adopts a plan of complete liquidation and within the 12-month period beginning on the date of the adoption of the plan substantially all of the assets of the corporation are distributed in complete liquidation, then no gain or loss shall be recognized to the corporation from its sale or exchange of property within the 12-month period. However, section 337(c)(1)(A)[31] provides that section 337 shall not apply to any sale or exchange made by a "collapsible corporation" as defined in section 341(b). *499 (b) Definitions. -- (1) Collapsible Corporation. -- For purposes of this section, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in paragraph (3), or for the holding of stock in a corporation so formed or availed of, with a view to -- (A) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, before the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the taxable income to be derived from such property, and (B) the realization by such shareholders of gain attributable to such property. Thus, a collapsible corporation as defined in section 341(b) is one that is formed or availed of with "a view" to the action described in section 341(b)(1)(A) and (B). In *500 determining whether or not a corporation has the proscribed view contemplated by section 341(b), section 1.341-2(a)(3), Income Tax Regs., provides: A corporation is formed or availed of with a view to the action described in section 341(b) if the requisite view existed at any time during the manufacture, production, construction, or purchase referred to in that section. Thus, if the sale, exchange, or distribution is attributable solely to circumstances which arose after the manufacture, construction, production, or purchase (other than circumstances which reasonably could be anticipated at the time of such manufacture, construction, production, or purchase), the corporation shall, in the absence of compelling facts to the contrary, be considered not to have been so formed or availed of. However, if the sale, exchange or distribution is attributable to circumstances present at the time of the manufacture, construction, production, or purchase, the corporation shall, in the absence of compelling facts to the contrary, be considered to have been so formed or availed of. [Emphasis added.] The issue presented in this case is purely factual. Respondent *501 determined that Barbara Coal was a collapsible corporation within the meaning of section 341(b) and, therefore, not entitled to the nonrecognition benefit afforded by section 337 on the sale of its assets. Petitioner argues that the sale of Barbara Coal's assets and subsequent liquidation were attributable solely to unanticipated and unforeseeable circumstances beyond its control, within the meaning of the above regulation. Thus, petitioner contends that Barbara Coal did not have the proscribed view set out in section 341(b) and, consequently, was not a collapsible corporation. [32] Respondent's determination is presumptively correct and petitioner has the burden of proving otherwise. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Petitioner argues that the threat of foreclosure by the United Penn Bank was the ultimate factor leading to the sale of Barbara Coal's assets and subsequent liquidation. Petitioner contends that the threat of foreclosure was precipitated by delays in completing the breaker renovations, increased costs, and Barbara Coal's inability to obtain additional financing. Petitioner asserts that the delay, the increased costs, the inability *502 to obtain additional financing, and the bank's threat of foreclosure were unanticipated and unforeseeable circumstances beyond Barbara Coal's control. Petitioner submits that the facts of this case are comparable to the circumstances in other cases where the courts have held that due to changed circumstances the collapsible corporation provisions were not applicable. [33] Thus, we must examine the facts that petitioner asserts constituted unanticipated and unforeseeable circumstances beyond Barbara Coal's control. *503 Petitioner's version of the facts is based primarily on the testimony of James J. Durkin, Jr., in regard to certain alleged statements and representations made by the late Mr. Roller. Mr. Durkin, Jr., testified that during the contract negotiations for the renovation of the Loree Colliery, Mr. Roller told him that the plant contained an existing fine coal processing system that would be tied in and work perfectly after the renovations were completed. According to Mr. Durkin, Jr., the contract price included the tie-in of the fine coal system. Mr. Durkin, Jr., further testified that during a telephone conversation with Mr. Roller in December of 1973, he was informed by Mr. Roller that an additional $ 250,000 would be required to make the fine coal processing system operational and an additional $ 150,000 to $ 200,000 to complete the work under the original contract. Mr. Roller also allegedly stated at this time that the renovations would take an additional six months to complete. Unfortunately, Mr. Roller had died before the trial, and we have not had the benefit of his side of the story. According to Mr. Durkin, Jr.'s testimony, believing that Barbara Coal needed an additional *504 $ 400,000 to $ 450,000 to complete the renovation work on the breaker, he attempted to obtain additional financing. Unable to acquire this additional financing and faced with the threat of foreclosure, according to Mr. Durkin, Jr., the directors of Barbara Coal decided to sell the assets and liquidate the company. While the scenario scripted by Mr. Durkin, Jr., surely depicts what would amount to unanticipated and unforeseeable circumstances, we find the facts are otherwise. The contemporaneous documentary evidence in the record and a careful weighing of all the testimony in the record present a different picture and simply do not bear out his testimony. [34]
Delayed Completion
Petitioner argues that in December of 1973, Mr. Roller informed James Durkin, Jr., that an additional six months was needed *505 to complete the renovations on the breaker. Petitioner contends that James Durkin, Jr., reasonably believed the renovations would take an additional six months and claims the events that ultimately occurred are irrelevant. Petitioner argues that the six-month estimate placed Barbara Coal in a precarious situation. Petitioner contends that for all practical purposes the 1973/1974 heating season had expired and Barbara Coal could not expect any significant coal sales to assist in making the interest and principal payments on the mortgage loan. However, except for Mr. Durkin, Jr.'s testimony, there is nothing in the record to indicate that Mr. Roller told him in December of 1973 that the renovations would take an additional six months to complete. The contemporaneous documentary evidence simply tells a different story. The renovations were not completed by November 15, 1973, the originally contemplated completion date under the contract. However, we think that the delay under the contract was a foreseeable circumstance. The contract provided, among other things, that the completion date was contingent on delays occasioned by labor troubles, strikes, shortages, fire, accident, *506 or other causes beyond the contractor's control. The contract did not provide that time was of the essence. In addition, the record indicates that the United Penn Bank and Barbara Coal anticipated a delay in the contract. The mortgage loan in the amount of $ 1,150,000 was approved by the United Penn Bank on April 19, 1973. However, the loan was not issued to Barbara Coal until October of 1973. In the meantime, the Roller Corporation had begun the renovation work and the United Penn Bank had made a series of advances to Barbara Coal. These advances were used, among other things, to make periodic payments to the Roller Corporation. The provisions of the mortgage loan required Barbara Coal to make interest payments for nine months, at which time the principal payments would begin. The first principal payment was not due until July of 1974. Thus, it appears that Barbara Coal adequately protected itself from any financial burden resulting from delays in completing the renovations. Moreover, we find that Barbara Coal was partially responsible for the delay in completing the renovations. The contract specifically required Barbara Coal to furnish the materials and labor for a portion *507 of the work. However, after a series of negotiations in the fall of 1973, it was finally agreed that the Roller Corporation would assume the responsibi lity for that work for the additional sum of $ 76,100. Although the parties did not specify a completion date for these additions, a completion date of November 15, 1973, obviously was not contemplated nor feasible. However, the time needed to complete the additions to the contract assumed by the Roller Corporation was undoubtedly a cause of the delay. The record indicates that during December of 1973 and January of 1974, most of the work billed by the Roller Corporation pertained to this additional work under the contract. The original contract work was completed by the end of January 1974. In February of 1974, all of the work billed by the Roller Corporation pertained to this additional work under the contract. By March 1, 1974, the Roller Corporation had completed all the billable work under the renovation contract. Although the plant was not accepted until May 20, 1974, the plant was operational and producing coal at some point in March of 1974 when the Roller corporation began debugging the plant. Petitioner argues that *508 any delay caused by these additions to the contract was to Barbara Coal's fault. Petitioner contends that Mr. Roller initially misinformed Barbara Coal concerning the cost of this work. See n. 16, supra. Mr. Roller allegedly stated this work could be done less expensively by local contractors. He purportedly estimated this work would cost between $ 15,000 to $ 20,000. Petitioner contends that Barbara Coal later discovered that local contractors wanted far in excess of Mr. Roller's estimate to perform the work. Again, except for the testimony of James J. Durkin, Jr., the record is simply devoid of any evidence to support this argument. In fact, the record indicates that Louis Falzone, one of the original shareholders of Barbara Coal, was a subcontractor for the Roller Corporation and provided all the labor needed for the renovation work. See nn. 15, 16, supra. Thus, the Roller Corporation ordered the necessary materials and directed the renovation work but did not provide any of the labor. Accordingly, based on all the facts and circumstances, we find that the delay in completing the renovation contract was not unanticipated and unforeseeable nor beyond Barbara Coal's *509 control. Increased Costs
Petitioner argues that in December of 1973, Mr. Roller informed James J. Durking, Jr., it would cost an additional $ 250,000 to install a fine coal processing system and an additional $ 150,000 to $ 200,000 to enable the plant to process 250 TPH (tons per hour) of coal material as specified in the contract. Petitioner also contends that Mr. Roller had told Mr. Durkin, Jr., that the Loree Colliery contained an existing fine coal processing system and that Mr. Roller stated during the contract negotiations that this system would be tied in to the breaker renovations and would work perfectly. We think the facts are otherwise. See n. 11, supra. The record simply does not support petitioner's argument. [35]
*510 After completing the feasibility studies, the Roller Corporation submitted drawings to Barbara Coal of the proposed renovations. There is no reference in these drawings to a fine coal processing system. The renovations contract dated April 9, 1973, between Barbara Coal and the Roller Corporation does not provide for the installation or the tying in of any purported existing fine coal processing system. Rather, the contract specifically guaranteed that the renovations would provide the capability of processing 250 TPH (tons per hour) of presized coal material ranging in size from stove to rice (2-1/2" to 3/16"). The record clearly indicates that fine coal is much smaller in size than 3/16". Moreover, Mr. Durkin, Jr., admitted at trial that this contract does not provide for the processing of fine coal. In view of the fact that the Loree Colliery breaker was being renovated in order to process coal in sizes from 2-1/2" to 3/16," it is wholly illogical to suggest that somehow this old turn-of-the-century breaker already contained a system to extract, recover and process even finer materials. [36] Mr. Roller was well-experienced in the renovation of breakers and Mr. Durkin, Jr., at *511 that time was wholly lacking in any such experience. The Court is satisfied that whatever it was, if anything, that Mr. Roller told Mr. Durkin, Jr., in regard to processing fine material, the latter either misunderstood what Mr. Roller told him or was otherwise incorrect in his testimony. See n. 11, supra. Indeed, the necessary equipment was installed at the Loree Colliery to process fine coal at some later point after the Roller Corporation completed the breaker renovations, and after testing of the slurry discharge indicated that it would be economical to expend the funds to install a fine coal processing system. See n. 36, supra.
*512 Based on all the facts and circumstances, we conclude that Barbara Coal's contract with Roller Corporation did not contemplate that the Loree Colliery would be able to process fine coal, and Barbara Coal had no reasonable basis for thinking that it would. Accordingly, the inability of Loree Colliery to process fine coal after the Roller Corporation completed the renovation work was not an unanticipated and unforeseeable event beyond Barbara Coal's control. In addition, except for the testimony of Mr. Durkin, Jr., which we do not accept, the record is devoid of any evidence that Mr. Roller demanded more money in December of 1973, to complete the contract. In fact, the documentary evidence contradicts Mr. Durkin, Jr.'s testimony. Roller Corporation completed the contract and the plant was accepted by the new owner on May 20, 1974. According to Mr. Pollock, the plant met the contract specifications, and no additional funds were needed to complete the contract. In fact, the Roller Corporation received payments under the contract totaling $ 516,670, which included the additions to the contract in the amount of $ 76,100. Thus, Roller Corporation received $ 440,570 for the renovations *513 pursuant to the original contract, which was just $ 1,570 higher than the original agreed-upon contract price. Accordingly, based on all the facts and circumstances, we find that petitioner has failed to prove that Mr. Roller demanded more money in December of 1973. Threat of Foreclosure
Petitioner next argues that Barbara Coal, unable to acquire the purported additional financing to complete the breaker renovations, was forced to sell its assets and liquidate because United Penn Bank threatened to foreclose on the existing mortgage loan. Mr. Durkin, Jr., testified that the United Penn Bank refused to increase the mortgage loan to cover the additional costs of the renovations. He also testified that he approached two local banks, the Wyoming National Bank and the Hanover Bank, attempting to obtain additional financing. Petitioners concedes that Mr. Durkin's testimony is unsupported by any documentary evidence but argues that it is corroborated by the testimony of three other witnesses. Petitioner argues Fred Davis, a long-time friend of the family and former president of the Reading Bank, testified that in late 1973 or early 1974, he made one attempt to obtain financing *514 on behalf of Barbara Coal. Mr. Davis approached Reese Jones, president of the First Valley Bank in Bethlehem, and asked him to generate some interest in Barbara Coal. Although Mr. Davis may have attempted to acquire additional financing on Barbara Coal's behalf, he never verified that these funds were in fact needed to complete the breaker renovations. Accordingly, we have accorded little weight to his testimony. Petitioner argues that Charles Parente, Barbara Coal's accountant, testified he had personal knowledge of Barbara Boal's inability to obtain additional financing to complete the breaker. The extent of Mr. Parente's personal knowledge consisted of recollecting a conversation he had with Robert Jones at which time Mr. Jones indicated that he was unwilling to loan any additional funds to Barbara Coal. However, Mr. Parente did not recall the time frame in which this conversation occurred or any specifics of the conversation. We found his testimony regarding this matter to be vague and unpersuasive. Petitioner also argues that Mr. Durkin, Jr.'s testimony was corroborated by Robert Jones, president of United Penn Bank. However, Mr. Jones' testimony was vague, ambiguous and *515 at best noncommittal. [37] We have accorded Mr. Jones' testimony little weight for that reason and also because it is completely inconsistent with what his bank actually did in connection with the Barbara Coal loan. The United Penn Bank made no record to document that Barbara Coal ever sought any additional funds to complete the breaker or that Barbara Coal's request for additional funds was rejected by the bank. See nn. 17, 23, *516 supra. We find it significant that United Penn Ban, holding a $ 1,150,000 or $ 1,300,000 mortgage on Barbara Coal's assets, could not produce any documentation pertaining to Barbara Coal's purported request for additional fund to complete the breaker or any documentation pertaining to denying such a request. Petitioner has failed to prove that Barbara Coal needed additional financing in late 1973 or early 1974 in order to complete the breaker renovations under the contract with the Roller Corporation. [38]
*517 Petitioner admits that Barbara Coal was not in default on its loan with the United Penn Bank, but argues that the fear or threat of imminent default is what forced Barbara Coal to sell its assets and subsequently liquidate. However, we simply cannot find that such imminent threat of default existed. In explaining why the United Penn Bank denied Barbara Coal's request to increase its loan, Robert Jones testified that the bank had lost faith in Mr. Roller and simply wanted to get the loan out of the bank. What United Penn Bank did after the sale of Barbara Coal's assets to Kenneth Pollock negates the urgency as described by Mr. Jones and is simply inconsistent with his description of the situation. Although the bank purportedly had lost faith in Mr. Roller, he continued the renovation work on the breaker after the sale to Mr. Pollock. The United Penn Bank continued to make payments to the Roller Corporation and the breaker was accepted by the new owners on May 20, 1974. Moreover, the total payments received by the Roller Corporation show that the contract was completed and accepted pursuant to its terms and without any meaningful cost overruns. According to Mr. Jones, the *518 United Penn Bank wanted to get Barbara Coal's loan "out of the bank." However, the record indicates Barbara Coal's outstanding balance of its mortgage loan with the United Penn Bank was $ 1,143,467 at the time of the sale to Mr. Pollock. See n. 25, supra. Of the $ 1,300,000 cash proceeds generated by the sale, only $ 243,467 was applied against Barbara Coal's outstanding loan balance. Thus, after the sale of its assets, Barbara Coal still had an outstanding mortgage loan with the United Penn Bank in the amount of $ 900,000, and the bank permitted the Durkins to walk away from the settlement with $ 800,000 in cash. That does not comport with Mr. Durkin, Jr.'s purported fear of imminent foreclosure. Allowing a $ 900,000 loan balance to remain after the sale of Barbara Coal's principal assets also does not comport with a lender anxious to get rid of a loan. After the sale of Barbara Coal's principal assets to Mr. Pollock, United Penn Bank had outstanding a loan of $ 1,300,000 to Pollock and a loan balance of $ 900,000 to Barbara Coal, or a total of $ 2,200,000, compared to the Barbara Coal loan balance of $ 1,143,467 (or $ 1,293,467 if the additional $ 150,000 is included) that *519 it had before such sale. See n. 25, supra.
Petitioner argues in something of a non sequitur that after the sale to Mr. Pollock, the United Penn Bank was in a much more secure position. Petitioner contends that the bank reduced it mortgage loan to $ 900,000 and had two $ 350,000 notes, plus the remaining land of Barbara Coal and the Durkins' personal guarantees as security. However, the record does not establish that the bank had any interest in the two notes. Moreover, the land remaining to Barbara Coal, after the sale to Mr. Pollock, was the same irregular pieces of land that Mr. Durkin, Jr., described at great length as practically worthless. See nn. 6, 26, supra. Moreover, the bank had the Durkins' personal guarantees prior to the sale. Finally, we think that the original loan secured by the real property and tangible assets of Barbara Coal, which were sold for $ 2,000,000, was considerably more secure than the loan subsequent to the sale. In any event, we cannot find that Barbara Coal sold its assets and subsequently liquidated under any threat or perceived threat of foreclosure. Based upon the record as a whole, we cannot find that the sale of Barbara Coal's *520 assets was attributable to unanticipated and unforeseen circumstances beyond Barbara Coal's control. Accordingly, we conclude that Barbara Coal was a collapsible corporation within the meaning of section 341(b) and therefore not entitled to the nonrecognition benefit afforded by section 337 on the sale of its assets. To reflect the foregoing, Decision will be entered for respondent.
Footnotes
1. On brief, petitioner conceded the correctness of respondent's disallowance of claimed automobile expenses in the amount of $ 17,955 and travel and entertainment expenses in the amount of $ 2,638 for the fiscal year ended April 30, 1974. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure. ↩
3. Mr. Durkin, Jr., testified that this agreement represented the point in time that he and his brother Edward Durkin acquired their initial combined 1/3 interest in Barbara Coal. That document, however, transfers Louis Falzone's entire interest in the General Agreement of January 7, 1971, but does not indicate that any stock in Barbara Coal was transferred. Moreover, the record does not indicate at what point Louis Falzone received his interest in the General Agreement. Both the General Agreement and the amending agreement were signed by James Durkin, Sr., in his individual capacity. At some point, James Durkin, Sr., assigned his interest in the General Agreement as amended to Barbara Coal. In any event, as of October 25, 1971, the original shareholders of Barbara Coal each held an interest in the General Agreement of January 7, 1971, in the same proportion to the percentage of stock each held in Barbara Coal. ↩
4. The officers of Barbara Coal, at the time of the adoption of this corporate resolution, were as follows: ↩
President
James J. Durkin, Sr.
Vice President
Edward E. Durkin
Secretary
James J. Durkin, Jr.
Treasurer
John R. Williams
5. Thomas H. Kiley, president of The First National Bank of Eastern Pennsylvania, engaged Robert Harvey to conduct an appraisal of the property to be purchased by Barbara Coal. By letter dated October 19, 1971, Robert Harvey informed Mr. Kiley that he was of the opinion that Barbara Coal was making an excellent buy and valued the property to be purchased as follows: ↩
Land
$ 700,000
Buildings
150,000
Minerals
300,000
$ 1,150,000
6. The land included in the sale that was unrelated to the Loree Colliery, apart from the coal deposits, consisted of little lots scattered throughout the area. Some of this land was irregular in shape, some of it had no access and consequently, a lot of the land was not saleable. Apparently, these various parcels remained from the days when the coal companies literally owned entire towns. The coal companies eventually began selling various parcels here and there to individuals and the unsold parcels were simply passed down over the years from coal company to coal company and ultimately were included in the sale to Barbara Coal. ↩
7. Barbara Coal's basis in the property purchased from Blue Coal, as reflected in the settlement statements, was $ 727,761.08. Barbara Coal's accountant, Frank Orlando, allocated the basis among the assets purchased in the following manner: Land
$ 444,761.08
Breaker
84,000.00
Land on which
breaker was located
10,000.00
Minerals
189,000.00
Frank Orlando allocated the basis of the property purchased according to the relative fair market values of the properties determined by Robert Harvey, who had appraised the properties in 1971 for the First National Bank of Eastern Pennsylvania. Mr. Harvey valued the 1,647.03 acres of land at $ 700,000, the buildings at $ 150,000, and the minerals at $ 300,000. See n. 5, supra.↩
8. Generally, coal material is hauled to the plant by truck and dumped into a large bin at the plant. From the bin, the coal material is fed onto a conveyer belt into the breaker or crusher that crushes the large sizes of coal material into smaller sizes. The coal material is then passed through a heavy media system that separates the coal from the waste material, usually rock. The finished material, which is then unsized coal, can either be piled on the ground as unsized coal or it can be fed through a sizing operation where the coal is separated into various sizes and placed in various coal bins according to size. ↩
9. The Roller Corporation had been formed in 1971 or 1972 and was located in Pittsburgh, Pennsylvania. At all times pertinent to this case, Charles Simmons was the vice president of Roller Corporation and owned fifty-one percent (51 percent) of its stock. William Roller was the president and owned forty-nine percent (49 percent) of the stock. Mr. Roller was a metallurgical engineer and had experience in the construction and renovation of breakers. He also held patents on certain coal-processing equipment. Mr. Simmons was the business manager and controlled the handling of the monies, invoices, and contracts. Unfortunately, Mr. Roller died prior to trial and was unable to give us the benefit of his expertise in this matter or his version of the facts surrounding the renovation of the Loree Colliery breaker. ↩
10. The size specifications in the contract did not include coal material referred to as fine coal. Fine coal is classified as sizes below 3/16". The extraction of fine coal generally occurs in the latter stages of the overall coal processing operation and essentially is a completely separate operation. The smaller sizes of coal not extracted in the original process go into the slurry line and are either discharged directly from the plant as unusable product or carried to a fine coal cleaning operation where "diester tables" are used to extract the fine coal material. The Roller contract did not provide for the installation of any "diester tables," or any other equipment to recover the fine coal material. ↩
11. James J. Durkin, Jr., testified that during the contract negotiations for the breaker renovations, Mr. Roller told him that the plant contained an existing fine coal processing system that would be tied in and work perfectly when the renovation work was completed. However, there is nothing in the contract to indicate the existence of this alleged oral representation or agreement. The Court is not persuaded by Mr. Durkin, Jr.'s testimony that there was any such existing fine coal processing system already in place in the plant. The Court is also not persuaded by petitioner's argument on brief as to certain unexplained equipment listed in the security agreement and by a page from a mining dictionary purporting to define certain coal sizes as fine coal. Absent some informed testimony to explain the nature of that equipment and the terms used, the Court will not assume that it was a fine coal processing system. In any event, Mr. Durkin, Jr.'s testimony as to what Mr. Roller allegedly told him is wholly illogical. This old turn-of-the century breaker that in the past could only recover 80 to 85 percent of the coal was being renovated to process coal sizes from stove to rice (2-1/2" to 3/16"). There was no mention in the contract of extracting, recovering, or processing anything smaller. Also the contract provided that no changes or additions were permitted to the contract except in writing, with an agreed price adjustment, and signed by both parties. In view of Mr. Roller's background and experience in the renovation of breakers and Mr. Durkin, Jr.'s then total lack of any such experience, the Court is satisfied that Mr. Durkin, Jr., must have misunderstood whatever it was, if anything, that Mr. Roller told him about processing fine coal. The Court does not believe Mr. Durkin, Jr.'s illogical and self-serving testimony. Diester tables were eventually installed at the Loree Colliery at some point after Roller Corporation completed the renovation work under its contract. Roller Corporation was not involved with this subsequent installation. ↩
12. It was projected that Barbara Coal would gross $ 4,900 per day from the Loree Colliery calculated at a daily rate of 350 tons of finished product valued at $ 14 per ton. The daily expenses were estimated at $ 3,320 resulting in a net profit each day of $ 1,580. It was estimated that the plant would operate 200 days each year. ↩
13. The minutes of the April 19, 1973 meeting also indicate that a lengthy discussion was held concerning the feasibility of the project, the role that U.G.I. Company, a local utility company and a large user of coal, would play, and the sale of Blue Coal Corporation. ↩
14. On brief, the parties suggest that the first principal payment on the mortgage loan was possibly due as early as March of 1974. This was apparently calculated from June of 1973. Although the mortgage instrument is dated June 15, 1973, the record clearly indicates that it was executed on October 2, 1973, and recorded on October 3, 1973. The check for $ 1,150,000 was issued on October 4, 1973. Accordingly, we think that the nine-month-interest-only period commenced in October and that the first principal payment was due in July of 1974, 9 months from the execution date. Our conclusion is borne out by the fact that petitioner paid interest and some principal payments on the notes that were issued to cover the advances made before the $ 1,150,000 check was issued on October 4, 1973. ↩
15. Louis Falzone, one of the original stockholders of Barbara Coal, was directly involved with the renovation work on the Loree Colliery. Mr. Falzone was on the site as a representative of Barbara Coal and also as a subcontractor on the job providing all the labor for the Roller Corporation. Roller Corporation treated Mr. Falzone exactly the same as any other subcontractor. Mr. Falzone had a standard purchase order covering the work and the rates for his employees. However, Mr. Falzone took directions from Mr. Roller concerning the work that had to be done. ↩
16. Again Mr. Durkin Jr.'s testimony attempts to impugn Mr. Roller's integrity, suggesting that Mr. Roller had somehow misled Barbara Coal during contract negotiations into believing Barbara Coal could perform the work more cheaply using local labor. We reject Mr. Durkin Jr.'s suggestion since it is clear that Louis Falzone was the subcontractor for all labor for Roller Corporation. See n. 15, supra.↩ In view of Falzone's dual role as labor subcontractor for Roller Corporation and as on-site representative for Barbara Coal, the labor cost should have been the same regardless of who performed this particular phase of the renovation work. 17. In contrast to this documentary evidence, Mr. Durkin, Jr., testified at the trial that the additional money above the $ 76,100 for additional contract work was for operating capital. In view of the uncertainty of Robert Jones, the president of the United Penn bank, about the date when Mr. Durkin, Jr., asked for additional funds for completion of the breaker, we think this was the only time additional funds were ever sought and at that time United Penn Bank approved the full $ 150,000 for completion of the breaker. As will be discussed later, we think it is significant that the bank records showed only two requests for money -- the original $ 1,150,000 loan and this increase to $ 1,300,000. There is no documentation at all as to Mr. Durkin, Jr.'s purported request in December of 1973 for a further $ 450,000 to complete the breaker renovation. ↩
18. This agreement amended and modified the original agreement between the parties dated February 2, 1972, as amended and modified by agreements dated May 1, 1972, May 2, 1972, April 13, 1973, and June 29, 1973. ↩
19. Although this mortgage agreement does not so indicate, this mortgage would have had to be a second mortgage. As of November 1, 1973, all of Barbara Coal's assets were already subject to a first mortgage that was held by United Penn Bank. ↩
20. This agreement specifically lists Barbara Coal as one of the joint buyers. Moreover, Barbara Coal's name is listed on the signature page of the agreement. Although the agreement received into evidence was an unexecuted copy, Barbara Coal's accountant, Mr. Parente, on cross-examination identified the document and stated that such an agreement was executed at the settlement on November 26, 1973. James J. Durkin, Jr., had testified earlier that Barbara Coal was not involved in this transaction and suggested that maybe at a later date Barbara Coal's name was removed from the agreement that was executed. However, Mr. Parente was present at the settlement and his testimony indicates that the agreement executed at that time was essentially identical to the copy received into evidence. Contrary to Mr. Durkin's testimony that Barbara Coal was a party to the Glen Lyon breaker transaction. ↩
21. The agreement with Mr. Williams provided for the payment of $ 75,000, payable as follows: (a) $ 15,000 on the execution hereof; (b) $ 60,000 on August 1, 1974, with interest at 8 percent per annum from the date of the agreement.
In addition, James J. Durkin, Jr., and Edward Durkin guaranteed that Barbara Coal would convey to John R. Williams by quitclaim deed a certain parcel of land on Luzerne Avenue in the Borough of Larksville, Luzerne County, Pennsylvania. Moreover, James J. Durkin, Jr., and Edward Durkin, individually and/or jointly, agreed to indemnify John R. Williams for any loss or judgment sustained against him arising out of any transactions and obligations between the parties thereto, especially any and all promissory notes from Barbara Coal to the Wyoming National Bank. ↩
22. The record is unclear as to whether or not there was any real negotiation. Mr. Durkin, Jr., testified that Mr. Pollock presented the $ 2,000,000 offer and that there was no negotiation. Mr. Pollock testified he was authorized by his undisclosed principal, U.G.I. Corporation, to go up to $ 2,000,000 to buy the Loree Colliery. ↩
23. This handwritten agreement is undated. Most astonishingly, none of the four persons could testify as to when the agreement was negotiated or when the agreement was reduced to writing. Considering the parties' extensive documentation for the minor addition to the Barbara Coal loan agreement, the Court finds it most peculiar that neither the United Penn Bank of which Mr. Jones was the president nor Barbara Coal could produce any better documentation of the sale of most of Barbara Coal's assets to Mr. Pollock. This undated handwritten agreement is not even signed on behalf of Susquehanna Coal Company, the other purported purchaser, yet certain minor changes are carefully initialed by Mr. Pollock and James J. Durkin, Sr., (initials "JJD" as opposed to son's initials "JJDJ"). For example, the change from 700 acres to 652 acres is initialed in two places and the change of the closing date from March 15, 1974 to February 25, 1974 is initialed. Had both parties to this lawsuit not agreed that the sales contract was executed, the Court would have had some doubt that it was. ↩
24. The agreement specifically provided that the acreage of real property to be acquired would be determined on a pro rata basis according to the the total fair market value as determined by Ed Poggi, a realtor. For example "if total acerage [sic] at market value amounts to $ 1,600,000 and there are 1,300 total acres, buyers will receive 7/13 of value." We note, however, that the agreement was specifically modified in two places to insert the 652 acres. See n. 23, supra.
In his appraisal report, dated May 1, 1974, Ed Poggi separately appraised each parcel of real property owned by Barbara Coal and arrived at a fair market value of $ 1,500,000. However, valued as a whole, the real property was appraised at $ 988,660. The value of the property under rock, coal, culm, and silt banks was determined without regard to the value of the banks. Apparently the 50 acres on which the breaker was situated was not included in the appraisal. In any event, the appraisal does not distinguish between the lands sold to Pollock and Susquehanna Coal Company and those retained by Barbara Coal.↩
25. Although the Barbara Coal loan had been increased to $ 1,300,000 on November 21, 1973 (see n. 17, supra), that loan increase was never posted to the bank's ledger card and seems to have been ignored by United Penn Bank at the time of the sale to Pollock as of February 25, 1974. The record clearly shows that none of that increased amount of $ 150,000 was ever paid to Barbara Coal or to Roller Corporation before the sale of Barbara Coal's assets to Pollock. Again, this confirms the Court's conclusion that there was never a request by Mr. Durkin, Jr., for an additional $ 450,000 above the $ 1,300,000 figure. United Penn Bank's records clearly showed a $ 900,000 balance after the principal payment of $ 243,467 on February 25, 1974. Barbara Coal received $ 800,000 in cash at that time and the United Penn Bank made no attempt to collect any part of that. In any event, after the sale of Barbara Coal's assets to Pollock, United Penn Bank had outstanding a loan of $ 1,300,000 to Pollock and a loan balance of $ 900,000 to Barbara Coal, or a total of $ 2,200,000, compared to the loan balance of $ 1,143,467 (or $ 1,293,467 if the additional $ 150,000 is included) that it had before such sale. Although the $ 1,300,000 loan to Pollock was stated to be for 30 days, the record shows that Pollock's $ 1,300,000 loan was still unpaid two years later in 1976. Remarkably the bank's records still showed a substantial unpaid balance on the Barbara Coal loan as late as 1978, even though Barbara Coal had been liquidated in 1975. Suffice it to say, the transactions surrounding the sale of Barbara Coal's assets, particularly the transactions with United Penn Bank, are shrouded in confusion. See also n. 23, supra.↩
26. The land that Barbara Coal retained after the sale to Mr. Pollock consisted of irregular parcels of land that Mr. Durkin, Jr., described at great length as practically worthless. See n. 6, supra.↩
27. The terms of the original contract dated April 9, 1973, provided for the retention of 10 percent of the contract price ($ 437,500) or $ 43,750 payable 30 days after the plant was operational and accepted by the owner, or 60 days after the equipment and materials had been erected on the plant site, ready for operation, whichever occurred first. ↩
*. These amounts were paid directly to Wyoming Electric Line Constructions Co., Inc.↩
28. On February 10, 1975, a combined meeting of the shareholders and directors of Barbara Coal was held, and they unanimously adopted a resolution to establish a trust in order to distribute the remaining assets of the company. On this same date, a trust was established naming James J. Durkin, Jr., as trustee. Barbara Coal distributed to the trustee all of its remaining assets, subject to certain liabilities that the trustees assumed, less the assets valued at $ 72,783 that if distributed to the shareholders. ↩
29. In its petition to this Court, petitioner alleged in the alternative that respondent erroneously determined the basis of the assets sold by Barbara Coal. Petioner raised this issue at trial through the testimony of Frank Orlando, the accountant who prepared Barbara Coal's tax return for the year in issue. However, petitioner failed to address this basis issue on brief and we consider it to have been conceded. In any event, the facts do not support a basis for the assets different from the basis determined by respondent. ↩
30. SEC. 337. GAIN OR LOSS ON SALES OR EXCHANGES IN CONNECTION WITH CERTAIN LIQUIDATIONS. (a) General Rule. -- If -- (1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and (2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period. ↩
31. Sec. 337(c)(1)(A) provides: (c) Limitations. -- (1) Collapsible Corporations And Liquidations To Which Section 333 Applies. -- This section shall not apply to any sale or exchange -- (A) made by a collapsible corporation (as defined in section 341(b)), or * * * ↩
32. Petitioner concedes that Barbara Coal otherwise comes within the definition of a collapsible corporation as set forth in section 341(b). If this Court finds that the sale of Barbara Coal's assets and subsequent liquidation were not attributable solely to unforeseeable circumstances beyond its control, then petitioner admits that Barbara Coal was a collapsible corporation and was not entitled to the nonrecognition benefit afforded by section 337↩. 33. See Commissioner v. Lowery,335 F.2d 680 (3d Cir. 1964), affg. 39 T.C. 959 (1963); Commissioner v. Solow,333 F.2d 76 (2d Cir. 1964) affg. a Memorandum Opinion of this Court; Riley v. Commissioner,35 T.C. 848 (1961); Temkin v. Commissioner,35 T.C. 906 (1961); Saltzman v. Commissioner,T.C. Memo. 1963-80↩. 34. We found Mr. Durkin Jr.'s testimony to be vague, speculative, self-serving, and above all wholly unsupported by any documentation at those critical points of his story where in the normal course of business, there should have been some documentation by Barbara Coal, Roller Corporation, or at least the United Penn Bank. See, for example, nn. 11, 17, 23, 25, supra.↩
35. On brief, petitioner hypothesizes that Mr. Roller intentionally understated the completion date by six months and understated the contract price by $ 400,000. Petitioner contends that Mr. Roller had large personal debts and under an agreement with Mr. Simmons, he was allowed to accept work on his own. What better way, petitioner suggests, to develop this work than to obtain this contract on behalf of the Roller Corporation and then at a later date to increase the amount of work and the price of the contract and have the work done by Roller himself for his own account. There are no facts in the record to support this disparaging polemic. Nullum iniquum est praesumendum in jure. Alternatively, petitioner suggests that these alleged underestimates were simply errors in Mr. Roller's judgment caused by a combination of the pressures of his financial situation and his alcoholic condition. We also do not find factual support in the record for this derogatory speculation. De mortuis nil nisi bonum. ↩
36. We note that Mr. Simmons, the vice president and majority stockholder in the Roller Corporation, was not aware that Mr. Roller made any representation to James Durkin, Jr., regarding the processing of fine coal at the Loree Colliery. In fact, Mr. Simmons first heard discussions about implementing a fine coal processing system at some point after the plant was operational. Mr. Simmons recalled that the slurry discharge from the plant was tested for coal residue to determine whether it would be economical to expend the funds to install a fine coal processing system. This testimony reinforces our conclusion that Mr. Durkin, Jr.'s testimony as to Mr. Roller's purported representations was incorrect. See n. 11, supra.↩
37. We found Mr. Jones less than forthright in some of his testimony. He testified that he was unaware of Barbara Coal's involvement with the acquisition of Blue Coal by the Great American Coal Company. However, the United Penn Bank acted as the escrow agent for the sale, and Mr. Jones was present at the settlement on November 26, 1973. Moreover, in approving the initial loan for Barbara Coal in April of 1973, the minutes of the discount committee indicate the acquisition of Blue Coal was discussed. See n. 13, supra.↩ We think that Mr. Jones was thoroughly informed at all times about the financial condition of Barbara Coal and the extent of the Durkins' personal involvement as well as Barbara Coal's involvement with the Blue Coal acquisition. 38. Assuming for the sake of argument that Barbara Coal needed additional financing to complete the breaker renovations, we think any difficulties in obtaining additional financing were caused by Barbara Coal's own actions. On November 1, 1973, Barbara Coal executed a mortgage in favor of the Institutional Investors Trust securing the principal sum of $ 8,530,000 in connection with the Raymond stock acquisition by the Great American Coal Company. In the protest prepared by Charles Parente on behalf of Barbara Coal that was received by the District Director in Philadelphia, Pennsylvania on January 12, 1979, Mr. Parente asserted that the stock acquisition of the Raymond group was the motivating factor which led to the decision to sell the assets of Barbara Coal on February 25, 1974. At trial, Mr. Parente testified that the statement in the protest meant that Barbara Coal had already borrowed so much on this other transaction that it did not have the ability to raise any additional funds. Thus, any difficulties in obtaining the alleged additional financing needed to complete the breaker renovations were caused by Barbara Coal and certainly within its control. ↩